UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/17/18

JOSE PIZARRO,

                Plaintiff,

-v-

BOARD OF CORRECTION; NEW YORK POLICE DEPARTMENT; N.Y.C.D.O.C. COMM. JOSEPH PONTE; WARDEN MONICA WINDLEY; DEPUTY WARDEN SECURITY CAPUTO; C.O. MAYO; *and* C.O. CAUCASIAN JOHN DOE,

                Defendants.

No. 16-cv-2418 (RJS)
OPINION & ORDER

RICHARD J. SULLIVAN, District Judge:

*Pro se* plaintiff Jose Pizarro ("Pizarro" or "Plaintiff") brings this action under 42 U.S.C. § 1983, alleging violations of his constitutional rights while he was an inmate at the George R. Vierno Center ("G.R.V.C.") on Rikers Island. Now before the Court is Defendants' motion for summary judgment on all of Plaintiff's claims. (Doc. No. 81.) For the reasons set forth below, the motion is GRANTED.

I. BACKGROUND[1]

Plaintiff commenced this action on March 31, 2016 (Doc. No. 2), and on July 15, 2016, he filed an Amended Complaint (Doc. No. 18) asserting Section 1983 claims against the New York City Board of Correction ("BOC"), the New York Police Department ("NYPD"), New York City Department of Correction Commissioner Joseph Ponte ("former Commissioner Ponte"), Warden

---

[1] In resolving this motion, the Court has considered Defendants' Local Civil Rule 56.1 Statement (Doc. No. 83 ("Def. 56.1")), Plaintiff's Counterstatement (Doc. No. 90 ("Pl. Opp'n 56.1")), Plaintiff's Local Civil Rule 56.1 Statement (Doc. No. 89 ("Pl. 56.1")), Defendant's Counterstatement (Doc. No. 95 ("Def. Opp'n 56.1"), the declarations submitted in support of and in opposition to the motion and the exhibits attached thereto (Doc. Nos. 84, 88, 94), Defendants' memorandum of law in support of their motion (Doc. No. 85 ("Mem.")), and Defendants' reply to Plaintiff's response (Doc. No. 96 ("Reply")).

Monica Windley ("Warden Windley"), Deputy Warden Caputo, Correction Officer Mayo ("Officer Mayo"), and an unidentified Caucasian correction officer ("C.O. Caucasian John Doe"). Specifically, Plaintiff alleges that on March 3, 2016, Officer Mayo performed a strip search of him in G.R.V.C.'s intake area, during which Officer Mayo made anti-Muslim remarks, instructed Plaintiff to "stick two fingers in [his rectum]," grabbed Plaintiff's "private parts," and choked Plaintiff. (Doc. No. 18 at 2-3.) Additionally, Plaintiff claims that five days later, on March 8, 2016, an unidentified correction officer conducted a strip search of Plaintiff and made harassing comments to Plaintiff in retaliation for his filing a grievance against Officer Mayo. (*Id.* at 3-4.)

Defendants filed the present motion for summary judgment on all of Plaintiff's claims on February 1, 2018. (Doc. No. 81.) In response, Plaintiff attempted to file his own motion for summary judgment (Doc. No. 87); however, because Plaintiff had failed to submit a pre-motion letter by the relevant deadline as required by the Court's Individual Rules and the case management plan and scheduling order entered in this case (Doc. No. 70), the Court denied Plaintiff's motion and announced that it would consider Plaintiff's submission only as an opposition to Defendants' motion. (Doc. No. 93.) Defendants' motion was fully briefed on March 27, 2018. (Docs. Nos. 96, 100.)

## II. LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is "no genuine dispute as to any material fact" where (1) the parties agree on all facts (that is, there are no disputed facts); (2) the parties disagree on some or all facts, but a reasonable factfinder could never accept the nonmoving party's version of the facts (that is, there are no genuinely disputed facts), *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); and/or (3) the

2

parties disagree on some or all facts, but even on the nonmoving party's version of the facts, the moving party would win as a matter of law (that is, none of the factual disputes are material), *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether a fact is genuinely disputed, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996). Nevertheless, to show a genuine dispute, the nonmoving party must provide "hard evidence," *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998), "from which a reasonable inference in [its] favor may be drawn," *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (internal quotation marks omitted). "Conclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998), as well as the existence of a mere "scintilla of evidence in support of the [nonmoving party's] position," *Anderson*, 477 U.S. at 252, are insufficient to create a genuinely disputed fact. A moving party is "entitled to judgment as a matter of law" on an issue if (1) it bears the burden of proof on the issue and the undisputed facts meet that burden; or (2) the nonmoving party bears the burden of proof on the issue and the moving party "'show[s]' – that is, point[s] out . . . – that there is an absence of evidence [in the record] to support the nonmoving party's [position]." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

Additionally, because Plaintiff proceeds *pro se* in this matter, the Court must "read his [submissions] liberally and interpret them to raise the strongest arguments that they suggest." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003) (quoting *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999)). However, "a *pro se* party's bald assertion, completely unsupported by evidence is not sufficient to overcome a motion for summary judgment." *Carmona*

3

*v. City of New York*, No. 13-cv-3273, 2016 WL 4401179, at *2 (S.D.N.Y. Mar. 1, 2016) (internal quotation marks omitted) (quoting *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

III. DISCUSSION

Section 1983 provides a civil cause of action for damages against any person who, acting under color of state law, deprives another of a right, privilege, or immunity secured by the Constitution or laws of the United States. *See* 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999). To prevail on a claim under Section 1983, a plaintiff must demonstrate (1) the deprivation of a right, privilege, or immunity secured by the Constitution or laws of the United States, (2) by a person acting under the color of state law. *Id.* The plaintiff must also establish that the defendant was "personally involved in the unconstitutional conduct." *Green v. Bauvi*, 46 F.3d 189, 194 (2d Cir. 1995). Here, Plaintiff raises an array of claims under Section 1983. The Court analyzes in turn the two incidents from which those claims arise.

A. March 3, 2016 Incident

Plaintiff's first set of claims stem from his interaction with Officer Mayo on March 3, 2016. Defendants submit four separate video clips that they claim capture this interaction and the events that immediately precede and follow it. (Docs. Nos. 84-2 ("Def. Exhibit B"), 84-3 ("Def. Exhibit C"), 84-5 ("Def. Exhibit D"), 84-6 ("Def. Exhibit E").) When such video evidence is available as part of the record, a court should, at the summary judgment stage, "[view] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 381 (2007). This shapes how a court should apply the relevant legal standards, because "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could

4

believe it, a court should not adopt that [latter] version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380.

As an initial matter, it bears noting that although Plaintiff raises some objections to the videos, they are all immaterial as to the admissibility of the videos for purposes of this motion. Specifically, Plaintiff never argues that Defendants doctored or altered the videos; nor does he suggest that the inmate who appears in all four videos is anyone other than himself, that the correction officer seen in Defense Exhibit C is anyone other than Officer Mayo, or that the videos fail to capture the entirety of his interaction with Officer Mayo on March 3, 2016. Instead, Plaintiff's principal objections to the videos relate to time coding. (Pl. Opp'n 56.1 ¶ 3.)[2]

By way of background, the four submitted clips all capture different views, angles, and areas within G.R.V.C. (Def. 56.1 at 1-4.) At the bottom of the frame in each of these clips is a thin black bar containing white text. (Def. Exhibits B, C, D, and E). Included in this text is a date. (*Id.*) In three of the video clips – Defense Exhibits B, D, and E – that on-screen date reads "2016-03-03"; however, in Defense Exhibit C, the displayed date reads "2016-03-04." (*Id.*) In addition to these dates, each clip contains, as part of the white text displayed in the black bar, a running clock that refers to the time of day in each clip. In the very first frame of each of these videos, the on-screen clock bears a different time: Defense Exhibit B reads "19:40:01"; Defense Exhibit C reads "00:44:56"; Defense Exhibit D reads "19:40:02"; and, Defense Exhibit E reads "20:44:56." (*Id.*) The on-screen clocks then proceed to run from these listed times for the duration of the clips. (*Id.*) Defense Exhibit E is nearly ten minutes long, while the other three exhibits each last for nearly an hour and five minutes. (*Id.*)

---

[2] Plaintiff also appears to object to Defendants' characterization of his clothing in Def. Exhibit C. (Pl. Opp'n 56.1 ¶ 4.) Nevertheless, while the parties spend a considerable amount of time and ink on the color of Plaintiff's pants in the videos, none of this discussion seems to materially impact the videos' validity or authenticity, especially in light of the evidence and analysis explored in the remainder of this section.

5

Plaintiff raises two main objections concerning the video clips described above. First, Plaintiff repeatedly contests the time codes that Defendants cite in their Local Civil Rule 56.1 Statement when referring to the relevant sections of certain videos. Specifically, Plaintiff insists that the time codes cited by Defendants differ from the actual times at which the events they depict took place. (*Id.* at ¶¶ 3-12.) This contention, however, appears to be based on a misunderstanding, since Defendants clearly explain in their declaration that any citation to a time code in their Local Civil Rule 56.1 Statement reflects the elapsed time of the individual video clip, and not the time of day at which the depicted events took place. (Doc. No. 84 at 2 n.1.) A comparison of the videos and the specific sections cited by Defendants in their Local Civil Rule 56.1 Statement confirms as much, thereby defeating Plaintiff's objection in this regard. (Def. Exhibit C at 10:47-10:50; Def. 56.1 ¶ 3.)

Second, Plaintiff appears to object to the incorrect date and time that appear at the bottom of the frame in Defense Exhibit C. (Pl. Opp'n 56.1 ¶ 3.) Defendants themselves, however, acknowledge this inconsistency. (Reply at 2-3). That is, while the date and time codes seen at the beginning of the video show "00:44:57" on March 4, 2016 instead of the actual date and time of the incident – which all agree took place in the early evening of March 3, 2016 (Def. Exhibit C at 00:01) – Correction Officer Cynthia Chadwick, whose responsibilities involve extensive work with the New York City Department of Correction ("DOC") video surveillance system, confirmed in her testimony that the time and date reflected on Exhibit C was an error. (Doc. No. 84-4 ¶ 3.)[3] Additionally, and perhaps more importantly, Plaintiff never actually disputes that Defense Exhibit C accurately depicts the specific interaction between himself and Officer Mayo that took place on

---

[3] Officer Chadwick's testimony refers to a "blue time stamp" that she claims correctly reflects the date and time of the depicted events. (Doc. No. 84-4 ¶¶ 3-4.) This blue time stamp does not appear in any of the videos currently before the Court; whether this is due to a technical error, a disparity between the videos before the Court and those she reviewed, or something else, the Court nevertheless finds that the difference is immaterial in light of Plaintiff's own testimony and the time stamps that do appear in the other videos.

the night of March 3, 2016 and which forms the basis of his claims. Notably, Plaintiff's own deposition testimony forecloses the possibility that the events in the video could have taken place on March 4, 2016, as he testified that he did not go through intake at G.R.V.C. that day, which was his birthday. (Doc. No. 94-1 at 95.) Plaintiff also testified that the magnetometer room in G.R.V.C.'s intake area was the only room in which he was alone with Officer Mayo on March 3, 2016. (*Id.*)

Moreover, the time stamps that appear within the other video clips so clearly align that there can be no doubt that the events depicted in Defense Exhibit C occurred, as alleged, on the evening of March 3, 2016. For example, Defense Exhibit B shows Plaintiff exiting the frame when the on-screen time stamp reads 19:55:45. (Def. Exhibit B.) In Defense Exhibit C – which, as described above, bears an incorrect on-screen time code – Plaintiff is seen entering and remaining inside the magnetometer room with Officer Mayo from an elapsed time of 10:47 to 15:30, an interaction lasting nearly five minutes. (Def. Exhibit C.) At the end of Defense Exhibit C, Plaintiff can be seen, in the video's background, entering a cell. (Def. Exhibit C at 15:30-15:55.) This footage overlaps with that in Defense Exhibit D, in which Plaintiff enters the same cell when the on-screen time stamp reads 20:00:39. (Def. Exhibit D.) This five-minute period between the time when Plaintiff exits the frame in Defense Exhibit B and enters the frame in Defense Exhibit D is nearly identical to the total amount of time Plaintiff spent with Officer Mayo in the magnetometer room in Defense Exhibit C. The clear and inescapable conclusion from this evidence is that Defense Exhibit C captures that five-minute window. Combined, all of this evidence establishes that there are no genuine disputes of material fact concerning the events depicted in the video clips submitted by Defendants or the extent to which they reveal the entirety of the March 3, 2016 interaction between Plaintiff and Officer Mayo; therefore, the Court will rely on the videos in evaluating Plaintiff's claims.

7

1. Excessive Force

Plaintiff appears to claim that Officer Mayo subjected him to excessive force during their interaction on March 3, 2016. (Doc. No. 18 at 3.) To succeed on a Section 1983 claim based on an allegation of excessive force, a pretrial detainee must establish that "force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015).[4] According to the Supreme Court, "objective reasonableness turns on the 'facts and circumstances of each particular case.'" *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Nevertheless:

> A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight. A court must also account for the "legitimate interests that stem from the government's need to manage the facility in which the individual is detained," appropriately deferring to "policies and practices that in the judgment" of jail officials "are needed to preserve internal order and discipline and to maintain institutional security."

*Id.* (internal brackets omitted) (citing *Graham*, 490 U.S. at 396) (quoting *Bell v. Wolfish*, 441 U.S. 520, 540, 547 (1979)).

In his Amended Complaint, Plaintiff alleges that Officer Mayo choked him and "grab[bed] [his] private part[s]." (Doc. No. 18 at 3.) He fails, however, to present any evidence to substantiate this allegation. Moreover, Defense Exhibit C captures the entirety of Plaintiff's March 3, 2016

---

[4] There are different legal standards for excessive force claims brought by pretrial detainees and inmates already convicted of crimes and sentenced to prison terms. "[T]he right of pretrial detainees to be free from excessive force amounting to punishment is protected by the Due Process Clause of the Fourteenth Amendment." *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999). Such claims proceed under the standard described above. *Kingsley*, 135 S. Ct. at 2475. By contrast, prisoners who have been convicted and are serving a prison term must proceed under the Eighth Amendment's Cruel and Unusual Punishment Clause. *Kingsley*, 135 S. Ct. at 2475. That standard is markedly higher than the Fourteenth Amendment standard for excessive force claims, since it defines excessive force as "force not applied in a 'good-faith effort to maintain or restore discipline.'" *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999) (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)). While the record in this case does not clearly establish Plaintiff's status on March 3, 2016, the fact that Plaintiff was returning to G.R.V.C. from court that day (Doc. No 84-1 at 30-31) suggests that Plaintiff was a pretrial detainee, and so the Court applies the Fourteenth Amendment standard. Because Plaintiff's claim fails to survive summary judgment under the more plaintiff-friendly Fourteenth Amendment pretrial-detainee standard, the Court concludes that it also would fail under the more rigorous Eighth Amendment convicted-prisoner standard, and therefore this factual issue is ultimately immaterial.

interaction with Officer Mayo in the magnetometer room at G.R.V.C., and at no point during their encounter does Officer Mayo make any physical contact with Plaintiff whatsoever. (Def. Exhibit C at 10:47-15:30.) Therefore, Plaintiff has presented no evidence to support a claim of excessive force.

Plaintiff also claims that Officer Mayo, during their interaction on March 3, 2016, made anti-Muslim remarks and instructed Plaintiff to "stick two fingers in [his rectum]." (Doc. No. 18.) Because the submitted videos do not contain sound, they cannot confirm or rule out this possibility. However, this lack of substantiating audio is ultimately immaterial, since "[a]llegations of threats or verbal harassment, without any injury or damage, do not state a[n excessive force] claim under 42 U.S.C. § 1983." *Ramirez v. Holmes*, 921 F. Supp. 204, 210 (S.D.N.Y. 1996) (citing *Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986)). As a result, there remain no genuine issues of material fact, and Plaintiff's excessive force claim fails as a matter of law.

### 2. Illegal Search

Plaintiff also seems to claim that Officer Mayo's strip search of him on March 3, 2016 was illegal. (Doc. No. 18 at 3-4.) This claim proceeds under the Fourth Amendment, which requires that searches of prison inmates be "reasonably related to legitimate security interests." *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 328 (2012) (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)). Nevertheless, this determination is "peculiarly within the province and professional expertise of corrections officials." *Bell*, 441 U.S. at 548 (quoting *Pell v. Procunier*, 417 U.S. 817, 827, (1974)).

Here, there can be no doubt that G.R.V.C. and Officer Mayo had a legitimate security interest in ensuring that an inmate returning to the facility did not sneak contraband inside its walls. *See Florence*, 566 U.S. at 328. This interest was compelling enough to justify a search during the intake process, even if the officer performing the search did not have a reasonable suspicion that

the returning inmate was concealing any contraband. *See id.* at 330. Put simply, "[t]he general practice of strip searching a detainee during housing searches and on the way to and from court appearances is not unconstitutional." *Thompson v. City of New York*, No. 16-cv-824 (PKC), 2017 WL 1929552, at *2 (S.D.N.Y. May 9, 2017) (citing *Florence*, 566 U.S. at 324, 339). While "strip searches performed with no legitimate penological purpose but merely to intimidate, harass, or punish" may be impermissible, *George v. City of New York*, No. 12-cv-6365 (PKC) (JLC), 2013 WL 5943206, at *7 (S.D.N.Y. Nov. 6, 2013), strip searches of prisoners reentering correctional facilities clearly serve a legitimate security interest, and Plaintiff has failed to present any evidence suggesting that Officer Mayo searched him on March 3, 2016 solely for the purpose of harassment. Here, Defense Exhibit C establishes that Officer Mayo's search of Plaintiff, who had just returned from court (Doc. No. 84-1 at 30-31), consisted of nothing more than Plaintiff removing clothing items until he could successfully pass through a magnetometer. (Def. Exhibit C at 10:47-13:15.) Although it could be argued that this did not even rise to the level of a "strip search," there was clearly nothing illegal or unreasonable about what did occur.

3. Freedom of Religion Claim

Plaintiff also appears to allege that Defendants violated his freedom of religion under the First Amendment when they required him to be strip searched. In essence, Plaintiff states that his Muslim faith "forbids exposing his private parts" (Doc. No. 18 at 3), and that, consequently, he should not have been required to undergo a strip search. (*Id* at 3-4.) This claim fails for two reasons. First, Defense Exhibit C incontrovertibly demonstrates that Plaintiff never did, in fact, remove all of his clothing, and that he merely stripped down to an undergarment in order to successfully pass through the magnetometer before getting dressed again. (Def. Exhibit C at 11:00-13:15.) The video therefore contradicts Plaintiff's assertion that he was compelled to violate a tenet of his religious faith.

Nevertheless, even if Officer Mayo had required Plaintiff to remove all of his clothing, this claim would still fail. As noted above, a "regulation impinging on an inmate's constitutional rights must be upheld 'if it is reasonably related to legitimate penological interests.'" *Florence*, 566 U.S. at 326 (quoting *Turner*, 482 U.S. at 89). The Court has already found that Officer Mayo's search of Plaintiff served a legitimate interest – namely, ensuring that the returning inmate did not sneak contraband into the facility. Therefore, Plaintiff's freedom of religion claim fails for the same reason as his illegal search claim. Indeed, courts in this District have consistently rejected claims that standard strip searches violate the First Amendment rights of Muslim inmates whose religion might forbid them from being seen naked by other individuals. *See, e.g., Jean-Laurent v. Wilkerson*, 438 F. Supp. 2d 318, 324 (S.D.N.Y. 2006); *Hurley v. Ward*, 549 F. Supp. 174, 186 (S.D.N.Y. 1982); *Aziz Zarif Shabazz v. Pico*, 994 F. Supp. 460, 473 (S.D.N.Y. 1998). Accordingly, this claim must be dismissed.

B. March 8, 2016 Incident

Plaintiff's second set of claims arise from a second strip search that allegedly occurred in his cell on March 8, 2016 in retaliation for his filing a grievance against Officer Mayo. (Doc. No. 18 at 3-4.) In his deposition, Plaintiff testified that on that day, a search team conducted strip searches of all the inmates in his housing unit. (Doc. No. 84-1 at 61.) According to Plaintiff, one member of that search team, an unidentified Caucasian correction officer, entered Plaintiff's cell and performed a strip search of him. During this search, Plaintiff claims that the officer repeated Officer Mayo's instruction from their March 3 interaction – *i.e.*, to "put two fingers in [his rectum]" – and that the officer then referenced Officer Mayo's alleged strip search of Plaintiff, so as to "[let] [Plaintiff] know [that the officer] knew what happened." (*Id.* at 62.) At no time, however, did the officer specifically mention Plaintiff's filed grievance. (*Id.* at 61-63.) Plaintiff testified that he

11

refused to comply, and the officer told him to "watch [him]self," but that the officer never made any physical contact with Plaintiff at any time during the strip search. (*Id.* at 62-63.)

1. First Amendment Retaliation Claim

Plaintiff appears to assert a First Amendment retaliation claim in connection with this incident, as he argues that the search and abusive language resulted from his filing a grievance against Officer Mayo in connection with their March 3 interaction. (Doc. No. 18 at 3-4.) To establish such a retaliation claim, a plaintiff must prove "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001).

With respect to the first element of Plaintiff's retaliation claim, the Second Circuit has held that "retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is [therefore] actionable under [Section] 1983." *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996) (citing *Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir. 1988). Not surprisingly, Defendants concede that Plaintiff's filing of a grievance against Officer Mayo in this case qualifies as protected speech. (Mem. at 11.)

Nevertheless, "[o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Dawes*, 239 F.3d at 493. Moreover, the law is clear that "[p]risoners may be required to tolerate more . . . than average citizens, before an action taken against them is considered adverse." *Id.* (citation and quotation marks omitted). Here, there are two potential actions that Plaintiff seems to believe should qualify as adverse: the strip search of Plaintiff in his cell, and the officer's comments to Plaintiff during that encounter.

Concerning the first, the Supreme Court has held that "wholly random searches are essential to the effective security of penal institutions" and therefore do not violate the Fourth Amendment rights of prison inmates. *Hudson v. Palmer*, 468 U.S. 517, 529 (1984). Applying this principle, in conjunction with the requirement of deference to prison officials in devising search procedures, *Florence*, 566 U.S. at 328, Judge Furman concluded that random strip searches of inmates while in their housing units in *the exact same facility* are lawful. *Israel v. City of New York*, No. 11-cv-7726 (JMF), 2012 WL 4762082, at *3 (S.D.N.Y. Oct. 5, 2012) (citing *Florence*, 566 U.S. at 328; *Hudson*, 468 U.S. at 529). The Court agrees.

Simply put, Plaintiff presents no evidence to demonstrate why a routine and ordinarily lawful strip search would deter a typical prisoner from exercising his or her First Amendment rights. Plaintiff pleads no facts indicating that the Caucasian officer singled out Plaintiff for strip searching; in fact, Plaintiff admits that his whole housing unit underwent strip searches. (Doc. No. 84-1 at 61.) Similarly, Plaintiff never provides any evidence to demonstrate why searches of all the inmates in a housing unit would prevent an inmate of ordinary firmness from freely asserting his or her First Amendment rights. In attempting to construe Plaintiff's claims liberally, one could perhaps conceive of a scenario wherein prison officials retaliated against an inmate for filing a grievance by searching his entire housing unit, thereby turning the other prisoners against the inmate in question and thus chilling the exercise of that inmate's First Amendment rights. But Plaintiff certainly never articulates anything close to this theory, and there is little reason to believe that the otherwise lawful and routine strip searches described here would somehow create a situation in which an inmate of ordinary firmness would be deterred from exercising his or her First Amendment rights. *See Dawes*, 239 F.3d 489, 493 (2d Cir. 2001) (prison official calling an inmate a "rat" and "informant" in front of other prisoners so as to create a fear of reprisals was not

enough on its own to constitute an adverse action). Thus, the Caucasian officer's strip search of Plaintiff does not qualify as an adverse action.

Nor do the alleged statements of the officer to Plaintiff during the strip search rise to the level of an adverse action. "Non-specific verbal threats, harassing comments and hostile behavior do not constitute adverse actions sufficient to state a retaliation claim." *Ross v. Westchester Cty. Jail*, No. 10-cv-3937 (DLC), 2012 WL 86467, at *7 (S.D.N.Y. Jan. 11, 2012) (citing *Morales v. Mackalm*, 278 F.3d 126, 131–32 (2d Cir.2002), *abrogated on other grounds*, *Porter v. Nussle*, 534 U.S. 516 (2002); *Dawes*, 239 F.3d at 493); *see also Amaker v. Annucci*, No. 14-cv-9692 (KMK), 2016 WL 5720798, at *5 n.8 (S.D.N.Y. Sept. 30, 2016), *aff'd*, 721 F. App'x 82 (2d Cir. 2018); *Quezada v. Roy*, No. 14-cv-4056 (CM), 2015 WL 5970355, at *21 (S.D.N.Y. Oct. 13, 2015); *Edwards v. Horn*, No. 10-cv-6194 (RJS) (JLC), 2012 WL 760172, at *15 (S.D.N.Y. Mar. 8, 2012). Here, the unidentified officer's alleged statement that Plaintiff should "watch [him]self" (Doc. No. 84-1 at 62) is not nearly "direct and specific enough to deter a prisoner from exercising his First Amendment rights." *Ross*, 2012 WL 86467, at *7; *see also Kemp v. LeClaire*, No. 03-cv-844S, 2007 WL 776416, at *15 (W.D.N.Y. Mar. 12, 2007) (threats including "your day is coming," "you'll be sent to your mother in a black box," and "you'll get your . . . ass kicked" did not qualify as adverse actions); *Bartley v. Collins*, No. 95-cv-10161 (RJH), 2006 WL 1289256, at *6 (S.D.N.Y. May 10, 2006) ("verbal threats such as 'we going to get you, you better drop the suit,' do not rise to the level of adverse action"); *Alicea v. Howell*, 387 F. Supp. 2d 227, 237 (W.D.N.Y. 2005) ("alleged statements . . . that plaintiff would 'have to pay the consequences' for filing a grievance . . . do not give rise to a First Amendment retaliation claim"). Additionally, the Caucasian officer's vulgar instruction to Plaintiff – though perhaps rude and mean-spirited – is the very sort of harassing comment and arguably hostile behavior that does not rise to the level of an

adverse action for purposes of an inmate's retaliation claim. As a result, Plaintiff's retaliation claim fails.

2. Plaintiff's Additional Claims Related to March 8, 2016 Incident

Plaintiff also appears to assert that the March 8 incident constituted an illegal search, a violation of his freedom of religion, and discrimination based on his race and religion. (Doc. No. 18 at 4.) But as explained above, the random strip search of Plaintiff's entire housing unit was permissible and reasonably related to the compelling governmental interest of penological safety. *See Israel*, 2012 WL 4762082, at *3 (citing *Florence*, 566 U.S. at 328; *Hudson*, 468 U.S. at 529. Consequently, Plaintiff's illegal search and First Amendment claims fare no better than his other claims. As for Plaintiff's discrimination claim, while Plaintiff's legal theory is difficult to ascertain, the Court need not reach this point, because Plaintiff alleges no facts to demonstrate that, during this March 8 incident, he was singled out for any particular treatment, let alone subjected to injury or harm, based on his race or religion. *See Reynolds v. Barrett*, 685 F.3d 193, 201 (2d Cir. 2012); *Cole v. Fischer*, 379 F. App'x 40, 43 (2d Cir. 2010) (summary order). As a result, Plaintiff's claim of racial and religious discrimination also fails.

C. Plaintiff's Derivative Claims Against Supervisory Individuals and Agencies

Because all of Plaintiff's underlying claims with respect to Officer Mayo and the unidentified Caucasian correction officer fail, his claims against former Commissioner Ponte, Warden Windley, Deputy Warden Caputo, the NYPD, and the BOC must also fail. *See Blyden*, 186 F.3d at 265 ("Of course, for a supervisor to be liable under Section 1983, there must have been an underlying constitutional deprivation."). But even if the claims against Officer Mayo and C.O. Caucasian John Doe survived, Plaintiff's claims against the named individual officials would still fail since Plaintiff never provides any evidence that these individuals were personally involved in any conduct that violated his constitutional rights, as the law requires. *Green*, 46 F.3d at 194. The

only evidence Plaintiff provides in this regard is that he sent them letters related to the incidents, and that they never responded. (Doc. No. 88 ¶ 14.) But "it is well-settled that allegations regarding the mere receipt of a letter, complaint or grievance from an inmate, and the recipient's subsequent inaction, is insufficient to establish a claim of personal involvement by a correctional supervisor." *Harris v. Westchester Cty. Dep't of Corr.*, No. 06-cv-2011 (RJS), 2008 WL 953616, at *9 (S.D.N.Y. Apr. 3, 2008) (internal quotation marks omitted) (citing *Islam v. Fischer*, No. 07-cv-3225 (PKC), 2008 WL 110244, at *3 (S.D.N.Y. Jan. 9, 2008); *Rivera v. Goord*, 119 F.Supp.2d 327, 344 (S.D.N.Y. 2000); *Watson v. McGinnis*, 964 F.Supp. 127, 130 (S.D.N.Y. 1997)). Moreover, agencies of the City of New York are generally not suable; this holds true for both the NYPD and BOC. *See* N.Y. City Charter ch. 17, § 396; *Jenkins v. City of New York*, 478 F.3d 76, 93 n.19 (2d Cir. 2007); *Colon-Rodriguez v. New York City Dep't of Correction*, No. 07-cv-8126 (GBD) (MHD), 2009 WL 995181, at *1 (S.D.N.Y. Apr. 13, 2009). As such, any claims against these agencies must be dismissed for this additional reason as well.

## IV. CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is GRANTED, and all of Plaintiff's claims are dismissed. The Clerk of Court is respectfully directed to terminate the motion pending at docket number 81, to mail a copy of this order to Plaintiff, and to close this case.

SO ORDERED.

Dated: July 17, 2018
New York, New York

RICHARD J. SULLIVAN
UNITED STATES DISTRICT JUDGE